May it please the court, Michael Kometa appearing on behalf of the appellants. I plan to spend, just to let the court know where I'm going, I plan to spend about two minutes or so clarifying one issue and two minutes discussing the theme of the case, which I believe is very important here. And I would like to reserve five minutes of rebuttal time, if possible. You have to be your own timekeeper. Yes, yes, Your Honor. Thank you. First, I clarify an issue that the county made for the first time on appeal, which I don't believe I covered adequately in the reply. On pages 10 to 11 of its brief, the county argues for the first time that the law does not ban welcome speech. The county relies solely on the preamble of the law, yet at trial the county, and this is very important, expressly conceded that the law did include welcome speech. That occurred on pages 109 through 112 of the trial transcript in a discussion with the trial judge. In addition, and despite the preamble, the clear language of the law itself, quote, includes, quote, protests and demonstrations, unquote. In Hill versus Colorado, the court used a dictionary to define demonstration. The court defined it as making, quote, a public display of sentiment for or against a person or cause, unquote. So let me provide an example. President Bush comes to town. There are two demonstrations, one for the president. You know, he's got enough problems. Well, let's pick a senator, any senator from across the nation. They come to town. There are two demonstrations, one in support of them, one against them. One involves welcome speech, one involves unwelcome speech, yet there are both demonstrations. So when the law states, quote, demonstration or protest, it certainly includes welcome speech. I would also like to discuss... Welcome to Pasadena. Thank you, Your Honor. I would also like to discuss the overall theme in this case because I believe it will help the court see the big picture here. The law is unconstitutional for four independently dispositive reasons. But when all these issues are distilled to their core, they really involve the same central theme. Does the law create a proper balance between free speech and residential privacy? Stated another way, does the ordinance ban public interest picketing beyond the point where picketing creates a captive audience in the home? Suppose these picketers had been using, were in large numbers and had bullhorns at this 300-foot buffer. Would 300 feet be impermissible under that circumstance? Yes, because the law is not narrowly tailored. And in that particular situation, it's not narrowly tailored because of this reason. The county may enact any other law to take care of problems of nuisance, bullhorns, trespass. All those laws are already in place and already would preclude such activity of creating a nuisance of that type in a residential neighborhood. So it doesn't need a 300-foot buffer to do that. Well, suppose that there are hundreds of people. You'll concede that in order for you to prevail here, we've got to find that it's facially unconstitutional, that it's unconstitutional in every application of the case. In other words, there's no way that this could be tailored to be constitutional. Well … In every aspect, it's unconstitutional. Well, I think there are two issues. There's the overbreath, which I agree with the court 100 percent on that issue. Then there's also the time, place, and manner test, which is a separate issue, which is almost like a flip side of the coin where the court sees whether this is narrowly tailored or not. And I think that's a little bit different. Then you're looking at whether there are other alternative means that are less restrictive that can be utilized. And that was the point that I was attempting to make. These laws already exist elsewhere that do that. Okay. To make it less restrictive, instead of drawing a line at 300 feet, where would you draw the line? If you were a legislator. Well, before I answer your question, let me state that the court doesn't have to decide that here today. It only needs to decide whether 300 feet is too far. Well, the line has to be drawn. And someone drew a line in the sand here. They drew it at 300 feet. Where would you say if they had drawn the line it would not be facially unconstitutional? Following the Madsen case, they can enact a 50-foot, 100-foot, 200-foot buffer. They can place a limit on the number of picketers. Madsen was an injunctive case. It was not a legislative case. And with injunctions, you can tailor things very closely. You can't do that if you're a legislator. You're dealing with broad principles. That's true. But the point I was attempting to make about Madsen was it listed numerous alternatives, which included limiting the number of picketers, limiting the time of day, limiting the days per week, smaller zone. The county can take all four of those and combine them together and maybe have a 100-foot zone and limit on the number of picketers, limiting on the time of day, and so forth. So 100 feet, you think, would pass constitutional muster? Yes. Under the cases — 150 feet. Let me push you a little bit. 150 feet. I don't know, Your Honor. I would be comfortable with 50 or 100 because in Thornburn and Douglas, which were Eighth Circuit cases, they did pass laws that were upheld. They included 50 feet on either side of a residence or one house on either side. In the case of Douglas, they were dealing with 75-foot lots. So I would say that 50 or 100 foot would survive constitutional scrutiny. But anything beyond that, I think, is highly suspect. Well, how can we — we don't want to be accused here of legislating from the bench, I don't think. And that's not what the appellants are asking you to do. They're asking the court to look at prior case law, look at common sense in terms of — Well, sure. But this is a facial challenge, and we are in a different posture from an injunctive hearing. And the odd thing about this case is that, in fact, there was a 300-foot setback from the residence in question, and you could have picketed right on the street in front of the house. So given that very clear example, how can we conclude that it's facially unconstitutional? Based on a narrowly tailored test, and the fact that other courts have universally struck down anything over about 50 or 75 feet. Well, if you had a case — I mean, in our analysis, it would seem as though with the facts presented by this particular case, it was sufficiently narrowly tailored because you have a setback that's 300 feet. If there were a different circumstance where you had a 75-foot setback, you might have a different case, which all of which suggest to me that it's really more — should be analyzed perhaps on an as-applied challenge as opposed to a facial challenge. OK. Let me specifically address that. I think that this is an especially appropriate case for a facial challenge because of the unique background of this case in which there was a trial, a fully developed factual record, and also a field trip, a judicial field trip by the judge in which the trial court asked both sides to select two houses. And the judge, the attorneys, visited five houses, including the target, and two on each side. And maps were submitted as evidence with a 300-foot buffer zone around the center point of where that residence would be. And those maps show that as to at least two particular residences, you could not have any speech in front of 16 residences on one map and 22 dwellings on the second map. And I think there is plenty of evidence because of the unique factual posture of this case and the fact that there was actually a full-blown trial, a full factual record, and a judicial field trip.  I'm sorry? Well, there are alternate means that we can use to make sure that the First Amendment concerns are satisfied. And that's why I was bringing up the issue of a balance because I don't think the trial court properly balanced in this case. I think there was clear language where the court saw residential privacy as a complete trump over free speech in this case. Well, that's when a house is targeted. The 300 feet does not apply if you're not targeting or focusing on a particular house. You could pick it right in front of a row of houses as long as you're not targeting someone in a particular house, as I understand, as I read this ordinance. That is correct, Your Honor. But as long as you target anyone, for example, let's say you target a child molester because you want him to change his ways and you also want to alert his neighbors that he is a child molester, you could not pick 10 houses, 50 houses, or 100 houses as long as you're targeting that one particular house. If it's 300 feet away. You could be 301 feet away from that house. Well, you couldn't walk in front of a whole row of houses as long as it included that one particular house. And that was conceded by the county during oral argument. In other words, there's a bubble around the targeted house. Exactly. Well, isn't the legislation here aimed at protecting a constitutional right? It may not be or it may be somewhat akin to the First Amendment right to peace and tranquility in one's residence home. They have a right to that too, a right of privacy in their home. And that's where the balancing comes in. Yes, Your Honor. But you would say that this would be all right as long as the line was drawn at 100 feet from the house. Yes, because this was undisputed during the trial when we looked at all of the houses, we went to a football field, and at any one of those four houses that were picked, you could not see any signs at 300 feet. You could not hear the message at 300 feet. It was clear that the message could not be heard. And that's why this law is not nearly tailored and it's facially overbroad as well. Well, if you do something like that, then you throw the burden of, you know, the noise and the disruption and the rest of it on the neighbors. Well, that's one of the things that happens when you have a bubble that's 300 feet, because now you're moving the protest 300 feet away, and now you're disrupting people who aren't targets. You know, in a lot of these cases, you're dealing with, you know, oil company executives or some animal rights protests. So now you have people that might be used to that kind of protest going on, and yet the protest isn't occurring in front of their house or near their house. It's now impacting the neighbors. The ordinance doesn't require a permit. No. What if it did on residential picketing? It did, and you'd have time, place, and manner restrictions. I'm not sure that that would matter, Your Honor. Why not? It would be somewhat more restrictive, certainly, because you couldn't have spontaneous speech and you would have to go through the permit process. Well, you just go in and you say, I want to picket so-and-so's house, and then they'll issue the permit, and they'll say, well, you know, it's a residential neighborhood, and these are the hours we think are reasonable, and we don't want you to disturb the neighbors, and bullhorns, and we don't want you out there 24 hours if people can't sleep. I suppose that would be another way of making this ordinance more narrow. For example, if you had a 100-foot bubble zone combined with a permit system that would place the police and other people on notice that people were going to be out there on a certain time and date, that would be another reason why this particular law is not nearly tailored. Well, that's your best argument, see, that the law is not narrowly tailored. Yes, Your Honor. As a matter of fact, that was going to be my closing argument because I was here yesterday and you kept asking for best arguments. So I guess I'll make that at this point. Did you find any yesterday? I'm sorry? Did you hear any yesterday? I think so. Before you make that, didn't Frisbee avoid the constitutional infirmity by just narrowly construing the similar language? You admit we're in line drawing here. You say 100 feet, there would be no problem. The legislature here drew it at 300 feet. Who's to say whether 100 feet or 300 feet is right or wrong? This Court is to say that because based on the evidence, you cannot see or hear the message at 300 feet, and that was clearly established. That's not exactly right, is it? The district court found you could hear the message at 300 feet. No, actually what the court found was at visiting the football field, you could see a sign but you couldn't read it, and at 300 feet you could not hear a message unless people were yelling. I'm reading from the Court's decision. At a slightly higher elevated tone, akin to a cheer or shout, the sound could be heard clearly and the verbal message understood at 300 feet. Right, and that is not based on the record. The trial court made some errors, and I had noted those in my briefing. Right, but to get beyond that, we have to find the district court was clearly erroneous and then adopt your proposed findings of fact in order to make a factual determination as to the amount of footage that would be required, right? How are we supposed to do that as an appellate court? No, and let me keep saying that this Court does not have to decide what a reasonable distance is. It's up to us to decide the footage. Isn't that what you said about maybe 10 seconds ago? No, no, it is not for this Court. Judge Allen said, how many feet do we decide? We're not a legislature. And you said, who decides? And you said, you decide. Well, this Court decides whether 300 feet is too far. It does not have to decide what an adequate law is, whether that might be 50 feet or 100 feet or combined with other less restrictive means. Assuming the district court was correct in its factual finding and had a slightly elevated voice that the message could be clearly heard at 300 feet, what does that do to your case? I believe he was referring there to the football field, and I believe he made another finding that in a house you could not hear the message and you could not see any of the signs. But to answer your question... Well, let me put it hypothetically then. Sure. Let's assume that the message could be heard at 300 feet, and we're not talking about sight, we're just talking about hearing. What does that do to your case? I think the Court still needs to look at whether there are other less restrictive means, or numerous less restrictive means, which I believe there are in this case. There are at least six that I've outlined, seven including the issue that Judge Gregersen just brought up, which includes getting a permit. I think that would also be less narrowed. So there certainly are numerous less restrictive means in this case. So I don't think it does too much to the case. If you're 300 feet away, you're aware of the picketers, though, that you're close enough to know that they're there, and they're not there because they're in love with you. They're trying to make a statement to you and to others. Given that fact, why should we say that the legislature drew the line at 300 feet? We should not say 300 is too much. You should have drawn it at 100 feet. Well, there's a presumption there that I disagree with. The record does not show that you are aware of picketers at 300 feet. It shows that you're aware of some degree of noise. You can hear some type of murmuring occurring, but you're not aware of picketers. You cannot see signs. Well, again, the district court said, and I know you disagree with it, that the message could be heard at 300 feet. I mean, the problem, it seems to me, is that this is a facial challenge. If you had an as-applied challenge in a case, you might well be able to show that you couldn't hear the message. But it's difficult to analyze every possible permutation of this and say, well, there are none of which the regulation would not offend the First Amendment. Right. I would point out that Frisbee was a facial challenge as well, and also one of the other cases that struck down an ordinance was also a facial challenge as well. So many of these cases are facial challenges. Does it make a difference? Here you had a person who was, what, a public figure? Yes. He was an elected official? Yes, Your Honor. And what if he didn't have that factor in the case? Someone like a child molester, for example, who's not a public official. Suppose he was an abortionist. What about child molesters? It's just one example that I happen to use in my briefing, Your Honor. Yeah, okay. I mean, you hear about that all the time. Let's just say that someone is angry at another person. Let's say there's a divorce case, all right, and the estranged wife doesn't think that the husband is generous enough with support, and she pickets in front of the house. Would that be treated differently than someone who is a public official who would have a sign on there to influence that public official? I don't believe they could be treated differently under this statutory scheme because then it would be content-based, and then strict scrutiny would apply, and I don't think any ordinance would withstand that level of judicial scrutiny. I'd be interested in hearing your best argument that Judge Ferguson said you were waiting for. Absolutely. I thought we already heard it, but go ahead. Okay. In this case, there needs to be a balance between free speech and residential privacy. In this case, the law is far larger than necessary to protect residential privacy, and the county has many less restrictive options from which to choose. For example, a 50- or 100-foot buffer zone, a Frisbee-type ordinance, which has been upheld in several other districts, a limit on the duration of picketing, a limit on the time of day of picketing, a limit on the number of days per week that persons may picket. All of that was discussed in the Madsen case. Or a combination of all of the above. And I would also add the example brought up by Judge Pragerson as to the possibility of applying for a permit in unison with a smaller buffer zone. All right. So my best argument is the law is not nearly tailored in this case to address the evil that it seeks to remedy. And the only thing I would emphasize at the very end is that numerous other cases dealing with residential picketing ordinances have been facial challenged. And because of the importance of free speech, judges or courts have addressed that exact issue and made decisions based upon facial challenges. And again, I would emphasize because of the unique nature of the factual record in this case and the fact that the court went out and visited four properties and that there are actually plat maps as part of the record with a 300-foot buffer zone around the property showing that in one case, 16 properties would fall within that bubble. And in the second one, second map, 22 properties would be included in that bubble. And I think that evidence shows that the buffer zone is just too large in this case. Well, the buffer zone was from the house. Exactly. And this house here was more than 300 feet back from the street. In that particular instance, in the subject property. Not the other four subject properties that were picked by both counsel. And one thing I would also add, which is very interesting, the 300-foot radius was made by a compass on those maps from the center of the property because before we visited the properties, we didn't actually know where the houses would be. And since 2,500 square foot might be 50 by 50, you would actually have to expand that buffer zone out by about 25 feet. So more than 16 properties, more than 22 properties would have been included in those particular examples. You know, they have these programs on computers where they have satellite pictures of maybe the whole world. And I went into an office and the guy was telling me about this. And I said, well, let me see what my house looks like. And I gave the address. It was focused right in. That's correct. You could see where it was and the lot and everything else.  Thank you, Your Honors. Counsel, may it please the Court. My name is William Johnson. I'm a senior deputy county counsel in San Diego County. I think I can be fairly brief and direct my comments strictly to the issue at hand, which is, is this ordinance narrowly tailored to serve a significant governmental interest? I'm here representing the county of San Diego. I think it is reflected in the record that there are really two cases nationwide that have really looked at a 300-foot restricted area. And in both situations, both the city of San Jose appellate court in California and this district court that have carefully analyzed how the 300-foot restriction applies have both concluded that it is narrowly tailored. And in particular, the trial judge in this case went to the extraordinary steps of going, if you will, a foot and a field out into the unincorporated area of San Diego County, which is where this ordinance applies. And so when you look at some of the ordinances that have been in some of the other cases, and we quibble over whether it's one house away or two houses away, when you go out into the unincorporated area of San Diego County where this ordinance applies, you're out into areas where four-acre lots, five-acre lots, where the property line may not even be clear. You may be looking at a fence. You may be looking at something. And so what the legislature, the County Board of Supervisors, chose to do in this case is select a defined area creating a specific distance that provides a certain measure of privacy and security to the people within the homes to prevent them from being the target of picketing. What about the neighbors? They get the brunt of it. Why should they have to suffer? Judge Pragerson, I think the best way to answer your question is no matter what device is used, whether it be a Frisbee-type ordinance or a two-house limit, one-house limit, the effect of the ordinance, and they pass constitutional muster throughout the country in different variations, the effect is always to push it on the neighbor. In Frisbee, it's to push it away from the front of the target's house to the neighbor's house. I think ultimately the idea is you're. Is that reasonable to push it on the neighbor? Well, I think the effect as a practical consequence is that it makes the picketers begin to reflect on what is the best way to get their message across, and maybe a general march. You want to chill them. Chilling, huh? Well, I mean, obviously by protecting. If that's the purpose of the statute, to chill the protesters, I don't think you're going to get very far. It's not. What is the purpose of the 300-foot? I gather from what you're saying that it's because some of it's unincorporated and you have large setbacks, but unfortunately one size fits all doesn't really particularly work in terms of the way these ordinances are usually analyzed. Well, one size would fit all no matter what size you pick, whether it be 100 feet, whether it be one lot, whether it be whatever. The farther or the greater distance that you put on the ordinance, then the more of those considerations come into play. Here you have the unusual case where the subject property was actually back 300 feet, and so you could have perhaps a legitimate picket. On the other hand, in most cases, and the ones that are in the record, you have 22 houses away, or how many houses? Which is, I think, probably not an effective picket. I want to just address that particular issue on the record because you can imagine what we did on this field trip. It's fairly reflected, I think, in the judge's decision. We went out. The first thing we did was we went to a football field, and I think the one nice thing about the 300-foot is it's something that most people can deal with. A hundred yards, a football field is sort of a distance that people have a common understanding of. When you learn how to handle 16- and 81-millimeter mortars, that's what you use. Or for the golfers of us, I always think of when I'm 100 yards away and I have my pitching wedge in my hand, I'm pretty close to the hole kind of situation. But it's a commonly understood distance, I think, is one benefit of selecting this type of distance. But we went out, and first we started at the football field. You can imagine all of us with the judge's clerks down at one end of the football field holding up our signs and started talking, and Judge Brewster got a sense of what this really is. And he said you couldn't read the signs at 300. You couldn't read the signs that they had made, and they were small picket signs. I could tell you that you could make a sign that you could read at 300 feet or 100 yards. But I think the point is that the district court judge went to great lengths to try to assess what is the impact of this ordinance and what is it sufficient. And I think it's interesting that he took a slightly different tact. Not is it serving the interest because it's keeping people sufficiently away that we're protecting the privacy.  Well, that's not the reason for the bubble, though. The bubble is to prevent people in their residential homes from being captive audiences. Correct. They don't have a right not to be aware that people don't like what they're doing. They have a right not to be captive, i.e., that they can't come and go from their home without feeling as if they're being imprisoned. It seems to me 300 feet, if someone doesn't like me and they're 300 feet away and they're complaining about me, I don't feel very captive. If they're on my sidewalk in front of my house, I'd have second thoughts about getting in my car and leaving. 300 feet, you know, let them talk about me as much as they want. It doesn't affect me. It seems to me 300 feet was building a little too much. Why? And under Frisbee and Mattson, it seems to be perhaps overextending the bubble. All right. And Your Honor's questions of counsel were kind of going the opposite direction. We're working at both. We're working at both. But I think now what's clear is what we're focused on is counsel concedes 100 feet. So let's parse it down the other way. Sort of in this zone of 100 is 100 enough? Is 300 too much? Kind of in that zone. And I think the way the district court approached it, you see, is there's kind of a threshold. And the threshold is defined by at what point are we certain? Well, it all depends on, you know, the terrain, the neighborhood, the size of the lot and all that. Exactly. And so if we have here, as Judge Thomas has said, one size fits all. And so is that narrowly tailored? We're giving people in the unincorporated areas of the county of San Diego an equal distance away from their residence of protection. So why not 250? Or 200? Or 150? Pardon me? I mean, the same argument applies to 250, 200, 150? Well, and I think that what – I mean, 300 is about as aggressive as any municipality has placed this restriction. It's about three times what courts have generally allowed, three times farther. There doesn't seem to be much of a rational basis except that it's a football field and everybody knows what a football field is. Well, let me go beyond that. I mean, I started my argument by saying that the city of San Jose case considers a whole lot of factors. And by analogy, some of them don't directly apply to residential privacy. But, for example, they cite to the fact that when you have a stay-away order that are commonly granted, 300 foot is the distance that's used. They cite to a number of other factors that are considered. You have in front of you the district court who, again, went out and, you know, we went to several different configurations. There are areas in the unincorporated areas that look just like any other city block, you know, houses next to each other. We went to a cul-de-sac that had sort of a unique configuration where the 300 foot area took you sort of around the corner of this small cul-de-sac to an edge. If you draw a radius, you're picking up houses that are behind and up slopes. And that's why, with due respect to counsel, that, I mean, we're outside. The idea was the 100 yards or the 300 feet got people away from the front of the house that far, the same as they would everywhere else. I think, as Judge Brewster, you know, found, that there are people in the unincorporated areas that can buy their own privacy by just having a large lot. And those people are subject to having folks literally in front of their house because they bought and paid for a large lot that gives them that zone of privacy. What this does is extend a similar zone of privacy to public officials, private citizens alike in the unincorporated areas. And then that's why it was adopted. What about the other people that are affected by it, the neighbors? I think the only thing I can say is that the shifting away from the house is going to occur no matter what ordinance you adopt. Whether a Frisbee ordinance that's clearly been held to be constitutional, it moves into the neighbors. We're moving them somewhere else. And if it's the point of the exercise of the protesters to get the word out to the neighbors, then they're in the position of getting that word out. The one last thing I'll close with, I think, is the best argument is that this ordinance, as the district court found, you know, using his thing of what's the threshold? Where's the threshold where we're serving the government interest without going too far? And in this case, he found that 100 yards gets them away where they're going to have to be yelling. They're going to have to be doing conduct that might fall under some other restriction if it was annoying the neighbors. In other words, if somebody's 300 feet away and trying to get their message by a bullhorn into this house, the neighbors are going to call the authorities and say, I want something done about this under a noise ordinance or something else that's going to apply to protect the neighbors. A silent picket that has an intimidating effect if it's right in front of your house may or may not have that same effect on the neighbors. That is, I guess, the best answer I can give you, Judge Pragerson, on that. But I think the universal is any ordinance that keeps people away from a house, whether it's 50 feet, one lot, two lots, all the things that have been held to be constitutional always, by effect, are shifting that in front of the neighbors. Let me ask you a different question. The district court order seemed to treat the right to tranquility as a trump card. And whether that was loose language or not, I don't know. But it would seem on a reading that the district court may have failed to do some balancing. Well, I think I have in mind the language you're talking about. Talk about unencumbered right to domestic tranquility. I'm not sure I would have selected those particular words if I'd been writing, been his law clerk and using the opinion. But I think that what he was trying to say is we really are trying to balance. But he didn't say that. He said that was an absolute right, which suggests to me he didn't balance that. So why shouldn't we send it back to do a proper balancing at the very minimum? Well, I think he did by looking at the threshold. In other words, he's saying that what we have is, as the Frisbee court said, a significant, a very important, you know, whatever words the Frisbee court used, we have something that's a very important right of residential privacy. He used that quote. And then he said, I'm looking at where the threshold is, is where does the ordinance serve that interest? And he concluded that at 100 yards, 300 feet, the ordinance is serving that interest. And while we're looking back and we can go back. And all the neighbors get mad at him, the target, and there goes that tranquility. Well, I think I've answered that. I mean, I've tried to answer that question as best I can. It's something that sticks in my mind. But the Frisbee court said the well-being, tranquility, and privacy of the home is certainly of the highest order. Highest order is what they called it. And they're talking about protecting an unwilling listener. And so these protesters, these picketers, have every right to communicate their message. We keep talking about child molester. There's nothing that prevents anybody from knocking on the door of every neighbor in the way and handing them a leaflet and saying, do you know John Smith? He's a child molester. None of that is prohibited by this ordinance. General marching in the neighborhood is not prohibited by this ordinance. What we're just talking about is a situation where a group of people post themselves in front of a house, within 300 feet of a house, for the sole purpose of intruding on the privacy of the resident. Is there any other court besides the San Jose State Court which has approved a bubble of 300 feet? Not that I'm aware of. I'm not aware of any either. It seems to me that this ordinance is pushing it to the extreme of even under Frisbee, which is the Supreme Court, you know, seminal case, if not only case of this. I understand. And it seems like most of the cases that have found their way up to the appellate courts have been six, eight circuit cases coming out of small towns, Fargo and others, where you can kind of. And they're usually coming out of towns where there's been a history of a particular event that's led to the enactment of the ordinance. And so they're really trying to move it away from a house in a neighborhood. And you kind of get a sense that there's a little bit of history that leads up to the ordinance. Well, the history is that aside from this one court, and this issue has been before many courts, 300 feet seems to be the extreme, taking that into consideration with the fact that people in residential homes, although they don't have the right to utter tranquility, have a right to some sort of privacy, even though they can be made aware of that people don't like them. It seems to me 300 feet, given the Frisbee opinion, is pushing the envelope quite a bit. Well, I would just respond that I think it is a reasonable balance. Going beyond that might be too far. That's a case that's not before us. But I think that 300 feet is the district court judge found, given all the circumstances. But at least twice or three times as far as what other courts have approved, except for the San Jose State Court case. I mean, you don't have any federal cases that go that far. That's correct. There are no such cases. And in unincorporated areas of the county, much like perhaps the areas in Fargo, you have some residential areas, you've got some quasi-rural areas, you have some places where you have some people who have purchased their privacy. So 300 feet may be appropriate when you're dealing with a completely rural area, but it may not be appropriate in the city, which suggests it's not narrowly tailored. Well, to me, I'd react just the opposite. I mean, it gives everybody the same. It gives everybody the same area protection. And remember, the distance is from the house. So what we're really talking about is the privacy of being able to have a certain area away where you have some privacy. You don't have people intruding on your house. They don't have a right of privacy. They don't have a right not to know the picketers are there and don't like them. They have a right not to be a captive audience in their home. A captive, not an audience, a captive in their home. And 300 feet, no one feels as if they're being falsely imprisoned in their home. It seems to me that the legislature here sort of pushed it beyond what their legitimate right was to allow people in their home to come and go if they don't want to listen to the picketers. They don't have a right to tranquility. They have a right not to be captive. And 300 feet is an awfully long distance to say that they're a captive if you're 299 feet from them. The issue is, you know, captive intrusion is the word I use, the ability to intrude into the home by being so close that you're basically in the face of the people. Your Honor, I concede... You can handle that by a permit process with a narrowly tailored ordinance that would consider these distances and neighborhoods. And perhaps just one person out there with a sign would make for the balance. What was the motivation behind this ordinance? There's nothing in the record, and I wasn't involved in it, in terms of any particular incident that I'm aware of that prompted it. I think it was more of a matter of a general legislative agenda for the county board. Other jurisdictions in San Diego County have been adopting various kinds of picketing ordinance like this, and somehow it got to the attention of one of the supervisors, and I'm not sure exactly what that was. But this case does not have the background. I mean, some of the cases that start with an injunction and end up with an ordinance get sent back and get modified. The ordinances get modified by injunctions. This doesn't have those aspects. It just has a decision by the legislature that 300 feet is an appropriate distance. And whether it should be 250 or 350, I would just respectfully urge this court to affirm the district court's finding that 300 feet is a reasonable balance between the competing interests that are involved in this case. Before you leave, I wanted to get the exact quote from the district court. The district court says the occupants are entitled to an unencumbered enjoyment of the tranquility and privacy of their homes without being subjected to unwelcome speech, and the First Amendment may not trample on those rights. That can't be an accurate statement of law, do you think? Well, in context, I think it is. Because I think what the court was trying to say by that is that in Southern California, that part of the privacy of your home is not having to go inside, lock all your doors and windows, and pull down the shades so you're not seeing what's going on. In Southern California, part of the tranquility and enjoyment of your home is being able to sit out on your patio, being able to be outside. Why does that differ from Montana? Well, you know, I've never been to Montana, Your Honor, and so I can only speak to what the district court was trying to evaluate, and I think that's what it was, and I think that's... I have no doubt that the district court was trying to preserve the tranquility of the home, which is fine, and the Supreme Court said that that protection could be afforded in Frisbee. What the Supreme Court did not say is that you can't be subjected to unwelcome speech. And that is what precisely what the district court said. I've looked at... Without being subjected to unwelcome speech, and the First Amendment may not trample on those rights. The second part to my answer in privacy is I think that lost in some of the debate here is that the First Amendment rights of the Petitioners, appellants here, are to use the public streets. They don't have a First Amendment right to a guarantee that they can reach into the home and get their message. And so I think that's the balance. How far do we limit their rights to use the public streets, offsetting the right of privacy and tranquility? And all I can ask this Court to accept is the legislative determination and affirm the district court finding that 300 feet, while it may well be at the outside limit, and I don't know that because no other case is in front of us and no other case has been decided, but it still is a reasonable distance, a reasonable balance, a reasonable time, place, and manner limitation that protects and serves the government interest, as the district court found. With that, I conclude. It's my best argument, I think. And if there's any other questions, I'd be happy to answer them. Thank you. Thank you. I have just one final argument, and Judge Pregerson gave me a great segue into it when he asked a moment ago, what was the motivation behind this ordinance? Well, quite frankly, there was none. I wanted to make sure that the Court had received my letter brief, which was submitted on January 3rd, regarding the Cuba case, which came out after this matter was briefed before this Court. And in that particular decision, it says, under the time, place, and manner test, the government has the burden to show that there is actual evidence that supports its justification for the law. In this case, Kline established that the county failed to furnish any evidence at all that justifies a 300-foot residential picketing ordinance, or even any evidence that justifies a less restrictive restriction. Kline established that the county presented no evidence that it undertook any study or any on-site research to determine the minimum distance needed to protect residential privacy. So after the Cuba case says we enact the law, you have to have evidence that there's a reason for the law, and also that you've looked into whether it's narrowly tailored. No evidence at all was submitted in this case that the county did anything like that. And in fact, the county conceded in its brief that the only reason it enacted a 300-foot restriction is because of the San Jose case. It basically looked at all the cases out there, picked the one that had the broadest restriction, and said, okay, we're going to go for this one. But they did no research, and no evidence was submitted of research in this case. And that would be my final point you're on. Yeah, but they could have general legislation looking toward future events. They don't have to respond to anything which is imminent. Much legislation is of that nature. Right. Your position is because there was nothing threatening out there, they had no reason to enact the ordinance. Not at all, Your Honor. What I'm saying is if they're going to come up with an especially this type of ordinance that impacts free speech, that you have to have some kind of evidence on hand that shows that you looked at a balance for an ordinance that minimally impacts free speech versus just going out and saying, okay, well, one other state court has approved this, so we're going to do it too. Well, you yourself acknowledged if it were 100 feet, you wouldn't be here today. Correct, Your Honor. So there is a need for the ordinance. It's just we're quibbling over how many feet the bubble should be. I agree. My only point was there's no evidence in this case that a 300-foot zone is necessary versus some combination of other less restrictive means of serving that same governmental state goal. How would you arrive at that standard? I think that the county has to go back to the drawing board, actually go out and visit properties and do some on-site research, some studies. Why are they required to do that? I'm sorry? Why are they required to do that? Legislature set arbitrary footage limits all the time, and the question is we measure that in terms of the constitutional challenge, but I don't know of anything that requires them to engage in a certain amount of research before enacting an ordinance. I agree with you regarding the rational basis test, which involves all other ordinances that don't involve a constitutional right. In this case, we're looking at intermediate scrutiny, obviously. I think in that case, under the KUBA decision, KUBA said, well, if you're looking at free speech, restricting free speech, you have to have some kind of minimal evidence out there saying this is the least nearly tailored or there's a good reason for having, in this case, a 300-foot. Well, if they picked a 100-foot requirement without any research, you wouldn't have any objections, right? That's an issue. I mean, you can't. I think that's a very interesting question, and I think I might agree with you because there's other case law out there that have upheld, say, 50-foot zone or one-house zone on either side, so I think it might be clear that you could skirt that without actually having evidence on hand. But I think when you're going, as the court has said, like three times what other courts have upheld, KUBA is simply one other reason why this law is not nearly tailored because there's no evidence in the record at all that that is, it's a reasonable balance between free speech and residential privacy. And that was my last point, unless you have other questions. There were no hearings before the ordinance was passed? There was a first reading and a second reading, and this was also evidence that was presented at the trial. People spoke either opposed or in favor of this ordinance, and there was discussion by the Board of Supervisors. But my only point is the county produced no evidence at trial that they actually balanced residential privacy versus free speech. It's just not in the record. What they likely did, as you've said, is that they took the San Jose case and said what's legally permissible, what's the most, and somebody else has done the balancing for us for these things, and we'll take that. Whether or not that passes must or not is another question, but it's not irrational for them to do that. And San Jose is interesting from this perspective. There are actually many reasons why San Jose was wrongly decided, but if I could encapsulate in a single sentence, if you look carefully at that case, what the court did there is they espoused the time, place, and manner test, but they actually applied the rational basis of scrutiny. They used a lower standard, although they gave lip service to intermediate scrutiny. All right. Thank you. Thank you. The matter is submitted.
judges: Pregerson, Cowen, Thomas